# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Sean Alan Lathrop,                                    Civil No. 10-2361 (DWF/LIB)

           Plaintiff,

v.                                                    **MEMORANDUM**
                                                      **OPINION AND ORDER**

City of St. Cloud, Minnesota; Dennis
Ballantine, individually and in his
official capacity as Chief of Police;
Richard Wilson, individually and in his
official capacity as Assistant Chief of
Police; Susan Stawarski, individually
and in her official capacity as Assistant
Chief of Police; James Mortenson,
individually and in his official capacity
as Police Lieutenant; and James Steve,
individually and in his official capacity
as Police Sergeant,

           Defendants.

_____

J. Ashwin Madia, Esq., Madia Law LLC, and Lori C. Peterson, Esq., Lori Peterson,
Esquire, counsel for Plaintiff.

Jana M. O'Leary Sullivan, Esq., and Patricia Y. Beety, Esq., League of Minnesota Cities,
counsel for Defendants.

_____

**INTRODUCTION**

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 23).  For the reasons set forth below, the Court grants Defendants' motion in part and denies it in part.

**BACKGROUND**

Plaintiff was hired as a police officer by the City of St. Cloud ("City") in September 2006.  (Doc. No. 26, O'Leary Sullivan Aff., Ex. 7 ("Lathrop Dep.") at 55.) Defendant Dennis Ballantine is the Chief of Police for the City of St. Cloud Police Department (O'Leary Sullivan Aff., Ex. 8 ("Ballantine Dep.") at 12); Defendants Richard Wilson and Susan Stawarski are Assistant Chiefs of Police (O'Leary Sullivan Aff., Ex. 9 ("Wilson Dep.") at 11, 12; O'Leary Sullivan Aff., Ex. 10 ("Stawarski Dep.") at 11, 12; Defendant James Mortenson is Police Lieutenant (O'Leary Sullivan Aff., Ex. 11 ("Mortenson Dep.") at 8, 9); and Defendant James Steve is Police Sergeant (O'Leary Sullivan Aff., Ex. 13 ("Steve Dep.") at 15, 16).

Before May 2009, Plaintiff was recognized by Defendants as an "excellent officer," who was consistently awarded mostly "excellent" or "competent" marks on his monthly performance reports.  (O'Leary Sullivan Aff., Exs. 22, 24; Doc. No. 30, Madia Aff., Ex. H.)  He received letters of recognition and commendation for his accomplishments, including his work on the Community Crime Impact Team ("CCIT"), his work against drunk driving, his performance in apprehending a sexual assault suspect, and for his work in recovering a stolen vehicle.  (Madia Aff., Exs. I–M.)  In February

2

2009, Plaintiff applied for and was strongly recommended for the position of School Resource Officer.  (Madia Aff., Exs. A & B.)  In April 2009, Defendants Ballantine, Wilson, and Steve wrote a letter of recommendation for Plaintiff to attend a master's program at St. Mary's University.  (Lathrop Dep. at 65; Madia Aff., Ex. C.)  This letter of recommendation stated that "Sean Lathrop has been recognized both locally and statewide for his work performance . . . [and] can produce work at a very high level with little supervision."  (Madia Aff., Ex. C.)

Plaintiff contends that until May 2009, his homosexual orientation was not publicly known in the City of St. Cloud Police Department, except to a small group of close personal friends.  (Lathrop Dep. at 92–106.)  According to Plaintiff, Defendants did not discover that he was gay until the Deputy Chief of Police of the Minneapolis Police Department sent a letter at Plaintiff's request to Defendant Ballantine requesting that Plaintiff work a community outreach booth in the Twin Cities Pride Festival.  (*Id.* at 106-08; O'Leary Sullivan Aff., Ex. 25.)  Plaintiff alleges that when he went to speak to Defendant Ballantine about the request, Defendant Ballantine had thrown the letter in the trash.  (Lathrop Dep. at 113–15.)  Defendant Ballantine denied Plaintiff's request to participate in the Pride Festival, and Plaintiff alleges that Defendant Ballantine prevented him from attending even on his personal time, stating that "[t]here are no gay people in St. Cloud," and that Defendant Ballantine did not feel the need to support that community.  (*Id.* at 116–18; Doc. No. 29 ("Lathrop Decl.") ¶¶ 10, 11.)  Defendant Ballantine denies making any anti-homosexual comments at that or any other time.

(Ballantine Dep. at 40–42.)  Defendant Steve denied Plaintiff's request to take vacation time to attend the Twin Cities Pride Festival because Plaintiff was scheduled to work the annual Granite City Days celebration.  (Steve Dep. at 103, 104.)  Plaintiff claims this was a pretext to prevent him from attending the Pride Festival in any capacity.  (Lathrop Decl. ¶ 11.)

Plaintiff contends that after he made his sexual orientation known to the Department in May 2009, Defendants began a "concerted effort" to paper his file with disciplinary documents in an effort to force him to resign.  (Doc. No. 28 at 8.) Defendants argue that disciplinary actions taken against Plaintiff were entirely unrelated to his sexual orientation and cite Internal Affairs investigations as evidence that Plaintiff had performance and attendance issues.  (Doc. No. 25 at 25; O'Leary Sullivan Aff., Exs. 1–6, 34, 44.)  Defendants also claim that they viewed Plaintiff's sexual orientation as a positive asset to the department that would add valuable diversity.  (Ballantine Dep. at 64, 65; Stawarski Dep. at 42, 43; Wilson Dep. at 63; Steve Dep. at 95, 113.)

In May 2009, Defendant Steve documented that he spoke to Plaintiff after Plaintiff was thirty minutes late for work.  (O'Leary Sullivan Aff., Exs. 35, 51; Lathrop Decl. ¶ 13.)  Plaintiff claims he was tardy because he was checking the Department's "bait car," and that he had been late to work several times over the past years for the same reason without disciplinary action.  (Lathrop Decl. ¶ 13.)  On June 24, 2009, Plaintiff was again disciplined for his actions surrounding a traffic report he submitted in which he had written and then crossed out four false entries.  (O'Leary Sullivan Aff., Exs. 26, 28;

Lathrop Dep. at 130–34, 139–45.)  Plaintiff alleges that he received this discipline solely

for "thinking of" submitting a false report. (Lathrop Dep. at 130.)  Defendants submit

evidence that not only were the four false entries crossed out, but the remaining entries

contained significant errors calling into question their veracity as well.  (O'Leary

Sullivan Aff., Exs. 4, 26, 33, 41.)  Upon documenting this violation in Plaintiff's e-file,

Defendant Mortenson wrote to Lieutenant LaBeaux that it was necessary that meticulous

documentation be kept in Plaintiff's file regarding "all of the issues that he has been

having," and wrote that "without the documentation, that is going to be interesting."

(Madia Aff., Ex. D.)  On May 15, 2009, Sergeant Burke placed a backdated disciplinary

report for an alleged scheduling violation committed by Plaintiff into Plaintiff's file.

(O'Leary Sullivan Aff., Ex. 51.)  Defendant Mortenson explained that this could simply

have been because Defendants "[hadn't] gotten around to it yet . . . but put them in

succession because it is a word document, so it reads chronologically."  (Mortenson Dep.

at 66–69.)

In July 2009, Plaintiff left his position as a School Resource Officer ("SRO").

(Lathrop Dep. at 88–91, 187.)  Plaintiff alleges that he "did not withdraw from [this]

position voluntarily."  (*Id.* at 88, 89.)  Defendant Wilson's e-mail documenting Plaintiff's

withdrawal states that "Officer Sean Lathrop has decided to withdraw his interest in

transferring to the SRO Unit."  (O'Leary Sullivan Aff., Ex. 32.)

Defendants Steve and Wilson went to Plaintiff's home on July 15, 2009, and asked

Plaintiff to take a ride with them in their squad car to have a conversation about the

difficulties he had been having.  (Lathrop Dep. at 143, 166–174, 272, 273; O'Leary

Sullivan Aff., Ex. 30.)  Defendants claim to have been worried about Plaintiff, and

wanted to speak with him about comments Plaintiff had purportedly made about

changing careers.  (O'Leary Sullivan Aff., Ex. 30.)  During this conversation, Defendant

Steve said, "Right now . . . you've got good rapport with everybody.  You've got a good

record with the police department as it stands right now."  (*Id.* at 5.)  Plaintiff discussed

stress and personal difficulties he had been experiencing, and voluntarily offered to give

Defendant Steve his service weapon when Defendant Steve indicated that he was worried

about Plaintiff's mental well-being.  (*Id.* at 7.)  This conversation was recorded without

Plaintiff's knowledge.  (Lathrop Dep. at 272.)

      In August or September 2009, Plaintiff alleges that Sergeant Steve told Plaintiff

that his sexuality was "getting in the way of his career."  (Lathrop Dep. at 191.)  This

followed an incident in which Plaintiff asked another male officer to perform a pat-down

search on a male suspect in light of Plaintiff's sexual orientation.  (*Id.*; *see also* Steve

Dep. at 71–74.)  Plaintiff also alleges that he overheard Defendant Steve say in a phone

conversation that Defendants were "going to make him so bored with his job that he'll

quit." (Lathrop Dep. at 202–04.)  Plaintiff inferred that Defendant Steve was speaking

about him, because he felt it was "pretty fitting in the time of what was going on."  (*Id.*)

      Plaintiff alleges that after his disclosure, Defendants:  (1) initiated unfounded

internal investigations against him (O'Leary Sullivan Aff., Ex. 44); (2) assigned partners

to Plaintiff that disliked him (Lathrop Dep. at 205–09); (3) removed Plaintiff from doing

Drug Talks at St. Cloud State University (Lathrop Decl. ¶ 18); (4) removed Plaintiff from

a silent alarm project that he initiated (*id.*); (5) removed Plaintiff from his position on the

neighborhood outreach committee (*id.*); (6) ceased copying Plaintiff on letters of support

from the community for his work (*id.*); (7) removed Plaintiff from his State Fair duty

because "there would be inadequate supervision there for an officer like [him]" (*id.* ¶ 26);

(8) removed Plaintiff from scheduled training opportunities (*id.* ¶ 27); (9) began altering

Plaintiff's schedule weekly to prevent him from developing a work rhythm and sleep

pattern (*id.* ¶ 28); (10) refused to recognize Plaintiff for assistance he provided to a stab

victim (*id.* ¶ 18); (11) denied Plaintiff leave to attend funerals in uniform (Lathrop Dep.

at 210–212); and (12) placed Plaintiff on a Performance Improvement Plan ("PIP") that

required him to document each minute of his day on a Daily Activity Report (*id.* at

218-20, 281; O'Leary Sullivan Aff., Ex. 42).

Plaintiff argues that Defendants failed to investigate or act upon his complaints of

disparate treatment despite repeated requests.  (Doc. No. 28 at 16.)  In July 2009,

Plaintiff's colleague Sergeant Ellering made a comment that Plaintiff interpreted to be an

affront directed at Plaintiff's homosexuality.  While on their way to a funeral, Plaintiff

alleges that Sergeant Ellering indicated that her squad car was in the "gay-rage."

((Lathrop Dep. at 171, 172, 174, 185, 186; O'Leary Sullivan Aff., Ex. 15 ("Ellering

Dep.") at 18–23.)  Ellering claims that she was not referring to Plaintiff's sexual

orientation, but said instead that her car was in the "gee-rage," joking about the accent of

the small town they were visiting.  (Ellering Dep. at 20.)  Afterward, Plaintiff complained

to Defendants Steve and Wilson.  (Lathrop Dep. at 171, 172, 174, 185, 186.)  No

investigation was conducted, and Plaintiff asserts that Defendants Steve and Wilson

responded that Plaintiff was being "oversensitive" and needed to "brush that stuff off."

(Lathrop Dep. at 163.)  The day after Plaintiff complained about Ellering's comment,

Defendant Steve documented that he received a report from Ellering that Plaintiff had not

completed three tobacco compliance checks.  (O'Leary Sullivan Aff., Ex. 2.)  Defendants

disciplined Plaintiff for these missed tobacco compliance checks, which predated

Plaintiff's complaint about Ellering by nearly a month, on July 28, 2009.  (*Id.*)

Defendants also disciplined Plaintiff at that time for not completing a disorderly conduct

arrest on April 19, 2009, and a DUI from July 26, 2008.  (*Id.*)  The Employee Misconduct

Form indicates that Plaintiff himself notified Defendants that he had missed these reports

due to "poor time management."  (*Id.*)  Defendant Steve issued a second Employee

Misconduct Form to Plaintiff after Plaintiff was five minutes late to work on July 13,

2009.  (O'Leary Sullivan Aff., Ex. 3; Ballantine Dep. at 143; Lathrop Dep. at 201.)

Plaintiff claims that in August 2009, he complained to Defendant Stawarski in a

meeting with Stawarski and Defendant Ballantine about what Plaintiff perceived to be

disparate treatment.  (Lathrop Dep. at 163–65.)  Plaintiff alleges that she responded by

telling him to "let some of this stuff roll off your chest."  (*Id.*)  Plaintiff also contends that

Defendant Stawarski told him that "gay people are known to be overly sensitive."

(Lathrop Dep. at 162.)  Defendant Ballantine denies that Plaintiff complained to him

about disparate treatment.  (Ballantine Dep. at 118, 145.)

On December 17, 2009, Plaintiff filed a charge of discrimination with the Minnesota Department of Human Rights ("MDHR").  (Lathrop Decl. ¶ 30.)  Defendants allege that this was the first notice they received of Plaintiff's discrimination and retaliation claims.  (Ballantine Dep. at 79–80, 112–113, 118, 145; Wilson Dep. at 122, 124; Stawarski Dep., at 20, 49–50.)  Defendants submitted a response to the MDHR on February 22, 2010.  (Ballantine Dep. at 148; Stawarski Dep. at 20.)  The MDHR informed the City of St. Cloud on April 29, 2010, that Plaintiff had withdrawn his complaint.  (Doc. No. 25, Defs.' Mem. in Supp. of Mot. for Summ. J., at 18.)  Plaintiff filed suit against Defendants on June 14, 2010.  (Doc. No. 1.)

Plaintiff alleges that after he filed this charge with the MDHR, Defendants disciplined him for being tardy, reduced his seniority, suspended him, and gave him the lowest possible score on his performance evaluation.  (Lathrop Dep. at 204, 205, 229–31, 267–69; O'Leary Sullivan Aff., Ex. 47.)  Plaintiff successfully completed his PIP in January 2010, and Defendant Steve documented that he told Plaintiff that "if he continued on track, as he has been for the past several months, that he would have a successful year." (O'Leary Sullivan Aff., Ex. 46.)  However, Plaintiff resigned from the Department in April 2010.  (Lathrop Dep. at 227; O'Leary Sullivan Aff., Ex. 49.)

In this action, Plaintiff asserts the following claims against Defendants: (1) violation of the Equal Protection clause of the United States Constitution, 42 U.S.C. § 1983 (Count 1); (2) conspiracy to deprive Plaintiff of his constitutional rights, 42 U.S.C. § 1985 (Count 2); (3) violation of the First Amendment freedom of expression,

association, and assembly, 42 U.S.C § 1983 (Count 3); (4) sexual orientation

discrimination in violation of the Minnesota Human Rights Act ("MHRA"), Minnesota

Statute § 363A.01, *et seq.* (Count 4); and (5) retaliation under the Minnesota Human

Rights Act (Count 5).  (Compl. ¶¶ 90–116.)

Defendants argue that any disciplinary actions taken against Plaintiff were entirely

unrelated to his sexual orientation.  In particular, they argue that:  (1) Plaintiff's

allegations regarding Defendant Steve's comments on the phone about making Plaintiff

quit out of boredom are speculation, and Defendant Steve denies making them; (2) the

actions Defendants took, including PIPs, did not constitute "discipline" under Department

policy; (3) disciplinary actions imposed were based in large part on Plaintiff's own

voluntary admissions about his conduct and performance, including statements in Internal

Affairs investigations; (4) Plaintiff cannot identify any single similarly-situated employee

whom Defendants treated differently; (5) Plaintiff mischaracterized the comment Ellering

made that Plaintiff found offensive; (6) Plaintiff mischaracterized the record in stating

that Defendants Steve and Ballantine prevented him from participating in the Twin Cities

Pride Festival; (7) Plaintiff was not disciplined for refusing to pat down a male suspect;

(8) Plaintiff relies upon hearsay when he claims that Defendants instructed others not to

speak with him; (9) Defendants documented Plaintiff's performance issues in his e-file

and other documents to be diligent about documentation, not because of Plaintiff's sexual

orientation; (10) Plaintiff admitted he would have been tardy to work even if he had not

been checking the "bait car" and does not dispute other incidents of tardiness;

(11) Plaintiff admitted he had experienced changes to his schedule throughout his tenure, not just following his complaints; (12) Defendants did not stop placing positive community letters in Plaintiff's personnel file after May 2009; and (13) when Defendant Steve approached Plaintiff regarding the missed tobacco compliance checks, Plaintiff himself volunteered that he had not completed other assignments.

Defendants argue that no material issues of fact exist, and now move for summary judgment.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record

that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th

Cir. 1995).  A party opposing a properly supported motion for summary judgment "may

not rest upon the mere allegations or denials of his pleading, but must set forth specific

facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 256 (1986).

## II.      Plaintiff's Claims

### A.      Equal Protection Claim

Plaintiff claims that Defendants violated 42 U.S.C. § 1983, which prohibits state

actors from depriving persons of any rights, privileges, or immunities secured by the

United States Constitution, including the right to Equal Protection secured by the

Fourteenth Amendment.  Plaintiff claims Defendants did this by treating him differently

in the terms, conditions, and privileges of his employment with the City of St. Cloud

Police Department than other employees were treated who were heterosexual, or not

perceived to be homosexual.  (Compl. ¶¶ 91, 92.)  Plaintiff alleges that Defendants

"engaged in a pattern and practice of discrimination, harassment, and retaliation" on the

basis of his sexual orientation, and deprived him of his rights by failing to investigate

Plaintiff's complaints of harassment, discrimination, and retaliation.  (*Id.* ¶¶ 93, 94.)

Plaintiff argues that by the Defendants' "deliberate indifference to the numerous

complaints of harassment and discrimination" by Plaintiff, they have effectively ratified

the policy of harassing, discriminating, and retaliating against commendable police

officers who are homosexual.  (*Id.* ¶ 95.)

12

To succeed on a § 1983 claim, a plaintiff must establish (1) a deprivation of a right secured by the Constitution or laws of the United States and (2) that the deprivation was committed under color of state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982).

In their Answer, the Officer Defendants contend that they are entitled to qualified immunity on the § 1983 claim. (Doc. No. 3 ¶ 84.) Qualified immunity shields government officials as well as private individuals from civil liability under 42 U.S.C. § 1983. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). A defendant is shielded from civil liability if it is shown that his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On a motion for summary judgment, the Court employs a three-part test to determine whether qualified immunity exists. *Goff v. Bise,* 173 F.3d 1068, 1072 (8th Cir. 1999) (citing *Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir. 1996)).

First, the plaintiff must assert a violation of a constitutional right. *Id.* Second, the alleged right must be clearly established. *Id.* Third, taking the facts in the light most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated the plaintiff's clearly established rights. *Id.* "Qualified immunity is available to all but the plainly incompetent or those who knowingly violate the law." *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In determining whether Plaintiff has satisfied the first prong, the Court examines Plaintiff's assertion that the officers violated his Fourteenth Amendment Equal Protection rights.  A party claiming an Equal Protection violation that involves neither a suspect class nor a fundamental right must prove that he "was treated differently by the government than similarly situated persons and the different treatment was not rationally related to a legitimate government objective." *Koscielski v. City of Minneapolis,* 435 F.3d 898, 901 (8th Cir. 2006).  The Eighth Circuit has held that discrimination based on sexual orientation is subject only to rational basis review.  *Richenberg v. Perry*, 97 F.3d 256, 260–61 (8th Cir. 1996.)

Ordinarily, the test used to determine whether employees are similarly situated requires that employees used for comparison have the same supervisor, the same standards, and the same conduct without any mitigating circumstances.  *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011).  Plaintiff does not identify any similarly-situated employees that were treated differently than he was for the same conduct.  However, Plaintiff claims that the Department treated *him* differently after he requested to become an openly gay police officer.  After Plaintiff requested permission to participate in the Pride Festival, Plaintiff alleges that he was subject to increased scrutiny, increased disciplinary measures, excessively thorough documentation, and surreptitiously recorded interventions.  Plaintiff's treatment before his decision to be an openly gay police officer was starkly different than his treatment after his decision to be open about his sexuality.  (Lathrop Decl. ¶ 12.)  As an example, Defendant Steve disciplined Plaintiff

eight days after Plaintiff's disclosure due to tardiness, when Plaintiff had been checking the department's bait car (conduct that had been previously acceptable). (*Id.* ¶ 13.) Plaintiff was also disciplined for grounds such as insufficient report writing, which he alleges had never happened before his disclosure, despite the fact that his writing had not changed in the intervening time. (*Id.* ¶ 18.) Defendants initiated multiple internal investigations against Plaintiff in the months after his discussion with Defendant Ballantine. (*Id.*) Plaintiff was removed from several of his assignments, and felt that he was being purposely ignored by his fellow officers. (*Id.* at ¶¶ 18, 26, 27.) Defendants deny that Plaintiff's punishment exceeded that applied to similarly-situated heterosexual officers (Answer ¶ 54), and argue that Defendants had legitimate, non-discriminatory reasons for disciplining Plaintiff (Doc. No. 25 at 28, 29); however, the Court finds that the almost immediate shift in Defendants' treatment of Plaintiff as alleged supports an inference of unlawful discrimination such that Defendants are not entitled to summary judgment on Plaintiff's Equal Protection claim.

Plaintiff has submitted evidence sufficient to create a material issue of fact surrounding whether Defendants treated Plaintiff differently once he became an openly gay police officer. If Defendants did treat similarly-situated persons differently, or if Defendants treated Plaintiff differently once they learned he was gay, the Court finds that there is no rational basis for this disparate treatment. Defendants have not alleged, nor does the Court find, that any legitimate governmental concerns would justify treating a homosexual police officer differently in terms of discipline than a heterosexual officer.

Plaintiff has established a genuine issue of material fact regarding whether Defendants violated his constitutional rights, and Defendants are therefore not entitled to summary judgment on Plaintiff's Equal Protection claim against the Defendant Officers.

With respect to Plaintiff's § 1983 claim against the City of St. Cloud, the Eighth Circuit has succinctly set out the standard for municipal liability under 42 U.S.C. § 1983, as follows:  "Municipalities are liable under Section 1983 only if a municipal custom or policy caused the deprivation of the right protected by the constitution or federal laws, or the municipal policy or custom was the moving force [behind] the constitutional violation."  *Avalos v. City of Glenwood*, 382 F.3d 792, 802 (8th Cir. 2004) (citations omitted).  For there to be § 1983 liability, "there must first be a violation of the plaintiff's constitutional rights."  *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 777 (8th Cir. 2001) (citation omitted).  "[A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom."  *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  Under this standard, there must be an unconstitutional act by the municipal employee before the municipality is liable.  *Avalos v. City of Glenwood,* 382 F.3d 792, 802 (8th Cir. 2004).

In this case, Plaintiff has submitted sufficient evidence to create a genuine issue of material fact as to whether Defendant Officers violated Plaintiff's constitutional rights. Plaintiff argues that when no investigations were initiated into his allegations of abuse and disparate treatment, and when his colleagues told him he was too sensitive or needed

to brush such treatment off, Defendants were perpetuating a policy of deliberate indifference to complaints of discrimination, effectively ratifying a policy of harassment, discrimination, and retaliation against him for his sexual orientation.  In light of this evidence, there remains an issue of fact regarding whether the City utilized an unconstitutional policy, custom, or practice.  Thus, Defendants' motion for summary judgment is denied as to Plaintiff's § 1983 claim against the City.

### B.      Conspiracy to Deprive

Plaintiff asserts that after learning that Plaintiff was gay in May 2009, Defendants acted in concert with one another, intending to and proceeding to conspire to deprive Plaintiff of his right to Equal Protection based on his sexual orientation, therefore depriving Plaintiff of his fundamental civil rights under the Fourteenth Amendment to the Constitution and violating 42 U.S.C. § 1985(3).

In order to prevail on a civil conspiracy claim, a plaintiff must show "that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff."  *Askew v. Millerd,* 191 F.3d 953, 957 (8th Cir. 1999).  A plaintiff must also prove a deprivation of a constitutional right or privilege in order to prevail on a civil conspiracy claim.  *Id.*  To advance past the summary judgment stage, Plaintiff must specifically demonstrate material facts that Defendants reached an agreement.  *See Marti v. City of Maplewood, Mo.,* 57 F.3d 680, 685 (8th Cir. 1995).

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes

that Plaintiff has presented no specific material facts, circumstantial or otherwise, that

Defendants formed an agreement to violate his constitutional rights. Plaintiff relies

entirely on a phone conversation he alleges he overheard between Defendant Steve and

an unknown third party, in which Defendant Steve allegedly said, "**[w]e're** going to make

him so bored with his job that he'll quit."  (Doc. No. 28, Pl.'s Mem. in Opp. to Mot. for

Summ. J., at 32.)  (Emphasis added.)  Plaintiff has presented no evidence to support his

inference that Defendant Steve was talking about him, nor has he presented any evidence

to support his claim that Defendants had reached any kind of agreement to deprive him of

a constitutional right.  Therefore, summary judgment is appropriate on this claim.

### C.    First Amendment Claim

Plaintiff asserts that Defendants violated 42 U.S.C. § 1983 by systematically

discriminating and retaliating against him after Plaintiff attempted to exercise his rights

under the First Amendment.  In particular, Plaintiff alleges that Defendants denied him

his constitutional rights of freedom of speech and freedom of association and assembly

when they prevented him from attending the Twin Cities Pride Festival, either in an

official or unofficial capacity, and subjected him to adverse employment actions as a

result.

Plaintiff requested permission to participate in the Twin Cities Pride Festival.

(Lathrop Dep. at 106–08.)  Plaintiff alleges that Defendant Ballantine refused Plaintiff's

request because Defendant Ballantine did not feel the need to support the LGBT

community.  (*Id.* at 118, 126.)  Plaintiff asserts that Defendants ultimately denied him the vacation time to attend the event on his own time, instead placing him on an assignment at Granite City Days in a non-essential position.  (Lathrop Decl. ¶ 11.)  The Court does not believe that these facts alone, even when viewed in the light most favorable to Plaintiff, are sufficient to allege that Defendants used the Granite City Days assignment as a pretext to prohibit Plaintiff from attending the Pride Festival, or that this constitutes a violation of Plaintiff's First Amendment right to freedom of speech, association, or assembly.  Therefore, Defendants are entitled to summary judgment on this count.

### D.    Minnesota Human Rights Act

Plaintiff asserts discrimination and retaliation claims under the Minnesota Human Rights Act ("MHRA").  Minn. Stat. § 363A.01, *et seq*.

#### 1.    Discrimination

Plaintiff alleges that Defendants discriminated against him on account of his sexual orientation during his course of employment with the St. Cloud Police Department in violation of the MHRA and that, as a result, he has suffered economic harm, lost earnings and benefits, embarrassment, emotional distress, humiliation, and other damages.

A plaintiff may survive a summary judgment motion on a claim of discrimination either by proof of "direct evidence" of discrimination, or, in an absence of direct evidence, by passing the three-part *McDonnell Douglas* analysis.  *Griffith v. City of Des Moines*, 383 F.3d 733, 736 (8th Cir. 2004).  Direct evidence is "not the converse of

circumstantial evidence," but rather "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Id.* (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)).

Under the *McDonnell Douglas* analytical framework, an employee bears the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. 792, 802 (1973). If Plaintiff establishes a *prima facie* case, the burden of production shifts to Defendants to show a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer articulates such a reason, Plaintiff then bears the burden of establishing that the proffered nondiscriminatory reason was mere pretext for discriminatory animus. *Id.* To establish a *prima facie* case of discrimination, a plaintiff must show that: (1) he was a member of a protected class; (2) he was qualified for his position; and (3) he suffered an adverse employment action under circumstances giving rise to an inference of discrimination. *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir. 1998).

The Court does not believe that Plaintiff has submitted sufficient evidence to show direct evidence of discrimination. Neither Defendant Steve's alleged declaration of intent to make Plaintiff so bored with his job that he would quit nor Defendant Mortenson's e-mail lamenting the lack of disciplinary documentation against Plaintiff are enough for a

reasonable juror to find a specific link between a "discriminatory animus" and Defendants' challenged decisions.

However, the Court holds that Plaintiff has alleged sufficient evidence to pass the *McDonnell Douglas* burden shifting analysis for purposes of summary judgment.  The record demonstrates that there are genuine issues of material fact surrounding what constituted the turning point of Plaintiff's job performance and reviews as a police officer.  Defendants claim that this turning point had nothing to do with Plaintiff's disclosure of his sexual orientation, but rather with a downturn in his performance on the job that was likely due to difficulties occurring in his personal life.  However, the temporal proximity of Plaintiff's disclosure and the adverse employment actions he experienced are sufficient to raise an inference of causal connection.  *See Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1121–22 (8th Cir. 2006); *Basset v. City of Minneapolis*, 211 F.3d 1097, 1105 (8th Cir. 2000).  A reasonable juror could find that Defendants discriminated against Plaintiff, considering that Plaintiff was disciplined five separate times, the subject of three separate internal investigations, removed from his SRO position, removed from Drug Talks at St. Cloud State University, removed from the silent alarm project that he initiated, removed from State Fair duty, surreptitiously tape-recorded, placed on a PIP, and given the worst possible performance evaluation, all within six months after he disclosed his sexual orientation.  (Doc No. 28 at 21, 22.)  As such, Defendants are not entitled to summary judgment on Plaintiff's MHRA discrimination claim.

### 2.    Retaliation

Plaintiff asserts that Defendants acted in retaliation and reprisal against him in violation of the MHRA by disciplining and ultimately constructively discharging him as a result of his MDHR complaint.  Plaintiff claims that, as a result, he has suffered and continues to suffer economic harm, lost earnings and benefits, embarrassment, emotional distress, humiliation, and other damages.

In order to establish a *prima facie* retaliation case under the MHRA, a plaintiff must show that:  (1) he engaged in protected conduct; (2) he suffered a materially adverse employment action; and (3) a causal connection exists between the two such that the protected conduct was a determinative factor in the adverse employment action.  *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).  To constitute a materially adverse employment action, an action must be one that "would have dissuaded a reasonable worker from making or supporting a claim of discrimination."  *Burlington N. & Santa Fe R. Co. v. White*, 548 U.S. 53, 57 (2006).

The parties do not dispute that Plaintiff engaged in protected conduct when he filed a discrimination charge with the MDHR in December 2009.  (Doc. No. 25, Mem. in Supp. of Mot. for Summ. J., at 32.)  However, Defendants argue that Plaintiff's retaliation claim fails because:  (1) Plaintiff did not sustain a materially adverse employment action; (2) there is no causal connection between his alleged protected conduct and any alleged adverse action; (3) Defendants had legitimate, non-discriminatory/retaliatory reasons for their employment actions; and (4) Plaintiff

cannot establish that Defendants' reasons are a pretext for discrimination.  (*Id.*) Plaintiff argues that after filing his charge with the MDHR, Defendant Steve disciplined him for being tardy, Defendants instructed Plaintiff's peers not to speak with him, and Defendants awarded Plaintiff low performance evaluations.  (Doc. No. 28, Pl.'s Mem. in Opp. to Mot. for Summ. J., at 29.)  In addition, Plaintiff argues that Defendants constructively discharged him.  (*Id.* at 25.)

Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job.  *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998).  To qualify as constructive discharge, an employer must have intended to force the employee to quit or must have reasonably foreseen the employee's resignation as a consequence of the unlawful working conditions it created.  *Id.*; *see also Jackson v. Arkansas Dep't of Education*, 272 F.3d 1020, 1026–27 (8th Cir. 2001).  A reasonable juror could find that the "avalanche of internal investigations, disciplinary actions, negative performance evaluations, surreptitious tape recording, removal from various positions, and suspension" (Doc. No. 28 at 26) that Plaintiff was subject to amounted to an environment that would force Plaintiff to quit. Therefore, the Court finds that Plaintiff has brought forward sufficient evidence to proceed with his retaliation claim, and Defendants are not entitled to summary judgment on this count.

**CONCLUSION**

Because the Court finds that genuine issues of material fact exist with respect to Plaintiff's Equal Protection claim and his MHRA discrimination and retaliation claims, Defendants are not entitled to summary judgment on these claims.  It appears to the Court that the turning point in this case was in May 2009, when Plaintiff disclosed his sexual orientation to the Department.  Before May 2009, Plaintiff's superiors recommended him to a master's degree program, awarded him the School Resource Officer position, and consistently gave him favorable performance reviews.  After May 2009, Plaintiff was subject to almost constant disciplinary actions.  Defendants argue that the increased disciplinary measures taken against Plaintiff were unrelated to Plaintiff's sexual orientation.  It seems to the Court, however, that an overnight metamorphosis is unlikely, and the Court concludes that a reasonable jury could find that Defendants discriminated against Plaintiff as a result of his sexual orientation.  Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff's Equal Protection claim and his MHRA claims and grants Defendants' motion for summary judgment on Plaintiff's First Amendment and conspiracy to deprive claims.

**ORDER**

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. [23]) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

24

1.      Defendants' motion for summary judgment on Plaintiff's MHRA discrimination claim is **DENIED**.

2.       Defendants' motion for summary judgment on Plaintiff's MHRA retaliation claim is **DENIED**.

3.      Defendants' motion for summary judgment on Plaintiff's Equal Protection claim is **DENIED**.

4.      Defendants' motion for summary judgment on Plaintiff's First Amendment claim is **GRANTED**.

5.      Defendants' motion for summary judgment on Plaintiff's conspiracy to deprive claim is **GRANTED**.


Dated:  January 23, 2012                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge